## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| **HYDROX CHEMICAL CO., INC.,** | ) | |
| **Plaintiff,** | ) | **Case No: 1:13-cv-07024** |
| | ) | |
| **v.** | ) | |
| | ) | **Judge Ronald A. Guzmán** |
| **DIVERSEY, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## ORDER

For the reasons stated below, Plaintiff's motion for summary judgment [68] is denied, and Defendant's motion for summary judgment [59] is granted. Defendant's motion to exclude expert testimony [56] is moot. Civil case terminated.

## MEMORANDUM OPINION

Hydrox Chemical Company ("Plaintiff") filed suit against Diversey ("Defendant") on September 30, 2013, claiming federal and common law trademark infringement and unfair competition. (Compl., Dkt. # 1.) This matter is before the Court on Defendant's Motion to Exclude Expert Testimony filed on December 1, 2014, (Def.'s Mot. Exclude # 56), Defendant's Motion for Summary Judgment filed December 1, 2014, (Def.'s Mot. Summ. J., Dkt. # 59), and Plaintiff's Motion for Summary Judgment filed December 22, 2014, (Pl.'s Mot. Summ. J., Dkt. # 68).

For the reasons set forth below, Plaintiff's motion for summary judgment is denied and Defendant's motion for summary judgment is granted. Defendant's motion to exclude the expert testimony of Rick Baldocchi is moot.[1]

---

[1] The Court finds none of Baldocchi's expert testimony relevant to the seven likelihood of confusion factors discussed below; accordingly, Defendant is entitled to summary judgment even if such testimony is considered. The Court therefore need not address Defendant's motion to exclude this testimony as inadmissible under Rule 702.

## Facts

The record reflects no material dispute as to any of the facts below.

Plaintiff Hydrox Chemical Company is an Illinois corporation founded in 1913 and currently owned and operated by President and CEO Kappana Ramanandan ("Ramanandan"). (Pl.'s Stmt. Fact, Dkt. # 72, ¶ 2-4.) Plaintiff has since 1913 produced products under the name "Hydrox," beginning with a 3% hydrogen peroxide solution and today including a variety of other chemical products. (*Id.* at ¶ 4-5; Def.'s Stmt. Fact, Dkt. # 61, ¶ 6.) Plaintiff's hydrogen peroxide solution is labelled for use as a "first aid antiseptic." (Def.'s Stmt. Fact, Dkt. # 61, ¶ 14.) All of Plaintiff's Hydrox-branded products are sold primarily to hospitals and healthcare distributors. (Pl.'s Stmt. Fact, Dkt. # 72, ¶ 18.) Ramanandan has also held meetings with Target and Wal-Mart regarding the sale of Plaintiff's products in those stores, but these discussions have not led to actual transactions. (*Id.* at ¶ 87-88.) In addition to producing Hydrox-branded products, Plaintiff also produces products under the "Fresh Moments" and "Kuretek" brands and products branded with the marks of Plaintiff's customers. (Def.'s Stmt. Fact, Dkt. # 61, ¶ 16.)

In 1971, Plaintiff secured federal registration for trademark number 0939378 covering "Hydrox Optimates Chemicals" and the following logo:



(Pl.'s Ex. 2, Dkt. # 74.) Since July 2014, Plaintiff has also held federal registration for the following logo under trademark number 85548268 for use in various types of disinfectants, as well as research and manufacturing of drugs, health, and beauty products:



(Pl.'s Ex. 3, Dkt. # 74.) From 2007 to 2012, Plaintiff spent a total of $22,529 in advertising its products. (Decl. David Merritt, Dkt. # 63, Ex. 22.) Below are characteristic examples of the labels affixed to Plaintiff's Hydrox-branded products:



(*Id.*, Ex. 10.)

Defendant Diversey, Inc. is a large Delaware corporation producing products for a variety of institutional cleaning, sanitation, and hygiene purposes for total sales of over $3 billion per year. (Pl.'s Stmt. Fact, Dkt. # 72, ¶ 11; Def.'s Stmt. Fact, Dkt. # 61, ¶¶ 20-22.)    In    2007, Ramanandan entered into discussions with PepsiCo regarding the possibility of Plaintiff

supplying a hydrogen peroxide-based cleaner for PepsiCo's bottling equipment. (Pl.'s Stmt. Fact, Dkt. # 72, ¶ 21.) As Defendant already supplied PepsiCo with cleaning products, executives at PepsiCo introduced Ramanandan to Doug Robertson, a Director of International Accounts for Defendant. (Pl.'s Stmt. Fact, Dkt. # 72, ¶¶ 23-27.) Robertson and Ramanandan discussed collaborating to produce disinfecting solutions for PepsiCo, after which Plaintiff sent a company capabilities overview to Robertson. (Pl.'s Stmt. Fact, Dkt. # 72, ¶¶ 28-29.) This overview was shared among several executives of Defendant, but Defendant ultimately decided against entering into a business relationship with Plaintiff because Plaintiff could not provide the paracetic acid that Defendant wanted. (Pl.'s Stmt. Fact, Dkt. # 72, ¶ 33; Def.'s Stmt. Add'l Fact, Dkt. # 94, ¶ 1.)

In September 2008, Defendant entered into a Worldwide Trademark Assignment with a Canadian corporation called Virox which produces a form of hydrogen peroxide. (Def.'s Stmt. Fact, Dkt. # 61, ¶¶ 25-28.) Virox had used the "Hydrox" mark since 2001 in Canada, and in 2002 registered trademark number 75568681 for the word mark "Hydrox" in connection with disinfectants, but never filed an Affidavit of Use to support the registration. (Pl.'s Stmt. Fact, Dkt. # 72, ¶ 47.) In the spring of 2009, Defendant began selling a general purpose cleaning solution bearing the name Hydrox (hereinafter, "Hydrox GPC"), which contained hydrogen peroxide produced by Virox but was not a disinfecting cleaner. (*Id*., ¶ 53.) Hydrox GPC was sold exclusively to institutional buyers, having never been offered for sale directly to consumers by Defendant. (Def.'s Stmt. Fact, Dkt. # 61, ¶ 51.) The largest purchasers of Hydrox GPC were Target and Wal-Mart. (*Id*., ¶ 52.) Executives of Defendant testified that they were unaware of Plaintiff's use of the Hydrox mark, and that they chose the name Hydrox because Virox already

used that mark in Canada. (*Id*., ¶ 38.) "Diversey" or "JohnsonDiversey" appeared on all labels of Hydrox GPC. (*Id*., ¶ 46.) Below is one of multiple forms of the product label:



(Pl.'s Ex. 21, Dkt. # 78 at 39-40.)

Defendant did not own a federal trademark registration for the word mark "Hydrox" at the time Hydrox GPC went on sale (Pl.'s Stmt. Fact, Dkt. # 72, ¶ 53.) Defendant applied for trademark registration for the term "Hydrox" in connection with cleaning products twice, in September 2008 and October 2009. (*Id*., ¶¶ 50, 51.) Both these applications were abandoned and no registration issued. (*Id*.) This abandonment occurred after the U.S. Patent and Trademark Office ("USPTO") found that Defendant's proposed use of "Hydrox" was likely to cause confusion with the mark "Hydrax" used for cleaning solutions by an unrelated third party called

Aseptix. (Def.'s Stmt. Fact, Dkt. # 61, ¶¶ 34-35.) The USPTO did not cite Plaintiff's registrations as a likely source of confusion in refusing to issue a registration to Defendant. (*Id*.)

In early 2011, Aseptix objected to Defendant's sale of Hydrox GPC because of the similarity between its mark "Hydrax" in connection with cleaners and disinfectants and Defendant's use of "Hydrox." (Pl.'s Stmt. Fact, Dkt. # 72, ¶ 62.) After unsuccessfully approaching Plaintiff about licensing the rights to the Hydrox mark, Defendant in April 2011 decided to rename Hydrox GPC to "PerDiem General Purpose Cleaner with Hydrogen Peroxide." (*Id*., ¶¶ 64-69.) Defendant's executives testified that they had sought a license from Plaintiff in order to strengthen Defendant's negotiating position with Aseptix. (*Id*., ¶ 67.) Before the Hydrox GPC name was officially discontinued in June 2011, Defendant increased production of the product. (*Id*., ¶ 70.) Despite the change, Defendant continued selling Hydrox GPC under its original name to Target and Wal-Mart until early 2012. (*Id*., ¶¶ 71-72.) While Defendant ceased selling Hydrox GPC in 2012, it is still listed for sale on the websites of some third-party resellers. (Def.'s Stmt. Fact, Dkt. # 61, ¶ 42; Pl.'s Stmt. Fact, Dkt. # 72, ¶¶ 76-77.)

Plaintiff was unaware of Hydrox GPC's existence during the two years Defendant produced it, only discovering the product in February 2013 when Plaintiff's independent salesman Rick Baldocchi ("Baldocchi") noticed the product while on a sales call. (Pl.'s Stmt. Fact, Dkt. # 72, ¶ 78-79; Def.'s Stmt. Fact, Dkt. # 61, ¶ 43.) Upon seeing the product, Baldocchi contacted Ramanandan and other executives of Plaintiff to inform them about Hydrox GPC. (Pl.'s Stmt. Fact, Dkt. # 72, ¶ 82.) There is no evidence of actual confusion or mistake as to the parties' respective products by anyone other than Baldocchi. (Def.'s Stmt. Fact, Dkt. # 61, ¶ 55.)

In September 2013, Plaintiff brought this action asserting federal and common law trademark infringement and unfair competition, seeking injunctive and monetary relief for Defendant's alleged infringement of the Hydrox mark. (Def.'s Stmt. Fact, Dkt. # 61, ¶¶ 1-2.)

## Summary Judgment Standard

A district court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In determining whether a genuine dispute exists as to any material fact, a court must view all the evidence and draw all reasonable inferences in favor of the non-moving party. *See Weber v. Univ. Research Assoc., Inc*., 621 F.3d 589, 592 (7th Cir. 2010). It is not appropriate for the court to judge the credibility of the witnesses or evaluate the weight of the evidence; the only question on summary judgment is "whether there is a genuine issue of fact." *Gonzalez v. City of Elgin*, 578 F.3d 526, 529 (7th Cir. 2009). Summary judgment is appropriate only if the record, taken as a whole, establishes that no reasonable jury could find for the non-moving party. *See Sarver v. Experian Info. Solutions*, 390 F.3d 969, 970 (7th Cir. 2004).

To prevail on all of its trademark infringement and unfair competition claims, Plaintiff must establish that (1) its marks are protectable, and (2) Defendant's use of the marks is likely to cause confusion among consumers. *See Packman v. Chi. Tribune Co.,* 267 F.3d 628, 638 (7th Cir. 2001). While likelihood of consumer confusion is a question of fact, it may be resolved on summary judgment if the evidence is "so one-sided that there can be no doubt about how the question should be answered." *Id*. at 637.

Here, the parties agree that Plaintiff possesses protectable rights in the "Hydrox" mark. Accordingly, only the likelihood of confusion among consumers is at issue. Defendant argues that Plaintiff has failed to introduce sufficient evidence upon which a trier of fact could find a likelihood of consumer confusion, and alternatively that Plaintiff has failed to prove entitlement to any remedy. (Def.'s Mot. Summ. J., Dkt. # 59.) Plaintiff argues that the evidence reflects no issue of material fact because Plaintiff has proven likelihood of consumer confusion as a matter of law. (Pl.'s Mot. Summ. J., Dkt. # 68.) Because the likelihood of confusion analysis is dispositive in this case, the Court does not address Defendant's arguments relating to Plaintiff's entitlement to a remedy.

## Discussion

In deciding whether consumer confusion is likely in a trademark case, "a court must ask whether consumers, and specifically consumers who would use either product, would be likely to attribute them to a single source." *Bd. of Regents of Univ. of Wis. Sys. v. Phoenix Int'l Software, Inc.*, 653 F.3d 448, 455 (7th Cir. 2011). More than a mere possibility of confusion is required, because "[m]any consumers are ignorant or inattentive, so some are bound to misunderstand no matter how careful a producer is." *August Storck K.G. v. Nabisco, Inc.*, 59 F.3d 616, 618 (7th Cir. 1995).

The Seventh Circuit has identified the following seven factors as important in determining the likelihood of confusion: (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to 'palm off' his product as

that of another. *Bd. of Regents*, 653 F.3d at 454. "No single factor is dispositive and courts may assign varying weights to each of the factors depending on the facts presented." *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 678 (7th Cir. 2001). Therefore, the court may conclude that there is no genuine issue of material fact as to the likelihood of confusion element even if there is a genuine issue of material fact as to one or more of the seven factors. *See AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 616 (7th Cir. 1993) (noting that summary judgment can be proper even where material issues of fact exist on some of the seven elements of the likelihood of confusion test). This is because the "weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other." *Schwinn Bicycle Co. v. Ross Bicycles, Inc.*, 870 F.2d 1176, 1187 (7th Cir. 1989).

The Court must begin by confronting Plaintiff's shifting theory of its case. Based on its Complaint, Plaintiff initially contemplated a typical theory of "forward confusion" trademark infringement wherein Defendant, as the junior user, sought to profit from the fame and reputation of Plaintiff's well-established products by passing its goods off as those of Plaintiff. (Compl., Dkt. # 1 at ¶ 26) (accusing Defendant of attempting to "profit from the goodwill and consumer recognition associated with Plaintiff's mark"); (*id*. at ¶ 29) ("Consumers are, therefore, likely to believe that Defendant's products that bear the Hydrox Trademark…are associated with Plaintiff, when that is not the case.") This is the traditional view of trademark infringement embodied in the Lanham Act. *See Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992) ("Usually, the confusion alleged is 'forward confusion'…In such a case, the junior user attempts to capitalize on the senior user's good will and established reputation by suggesting that his product comes from the same source").

In the course of responding to Defendant's motion for summary judgment, however, Plaintiff for the first time reframes its argument as sounding in "reverse confusion" (Pl.'s Mot. Summ. J., Dkt. # 68, at 9.) Reverse confusion occurs when "a large junior user saturates the market with a trademark similar or identical to that of a smaller, senior user." *Sands,* 978 F.2d at 957. The harm a plaintiff suffers in such a case is not the risk of his reputation being undermined by poor-quality knockoffs, but rather that consumers come to assume "that the senior user's products are really the junior user's or that the former has become somehow connected to the latter" such that the smaller senior user "loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets." *Ameritech, Inc. v. American Inf. Technologies Corp.,* 811 F.2d 960, 964 (6th Cir. 1987). In this case, the specific reverse confusion Plaintiff now asserts is that consumers will believe Plaintiff supplies Defendant with the hydrogen peroxide contained in Hydrox GPC. (Pl.'s Reply, Dkt. # 100, at 8) ("Hydrox is complaining that Diversey's use of the Hydrox mark…is likely to cause confusion as to whether Hydrox supplied the hydrogen peroxide for the product or was otherwise involved.")

This is more than simply a matter of labels; while the same seven likelihood of confusion factors are analyzed under both theories, several of them are applied differently in reverse confusion cases than in forward confusion ones. *See Sands*, 978 F.2d at 959 ("In a reverse confusion case, then, it may make more sense to consider the strength of the mark in terms of its association with the junior user's goods" rather than the senior user's goods); Christina P. Mott, *Multifactors, Multiconfusion? Refining "Likelihood of Confusion" Factors for Reverse-Confusion Trademark Infringement Claims to Achieve More Consistent and Predictable Results*, 47 SUFFOLK U. L. REV. 421, 443 (2014) (noting that Seventh Circuit reverse confusion cases

typically analyze "the commercial strength of the junior user's mark, rather than the senior user's" and turn the intent inquiry into "a bad-faith test to determine whether the junior user knew of the senior user's similar mark but proceeded anyway"). Moreover, even if the seven factors were applied in the same way in a reverse confusion case, "which factors are most important may differ." *World Wide Sales, Inc. v. Church & Dwight Co.*, No. 08 C 1198, 2009 WL 3765881, at *4 (N.D. Ill. Nov. 9, 2009).

A plaintiff, however is required to plead only "claims, not facts or legal theories." *Vincent v. City Colls. of Chi.*, 485 F.3d 919, 923 (7th Cir. 2007). Plaintiff's complaint adequately alleged consumer confusion; the precise nature of that confusion is not required, and may shift throughout the course of litigation. The few federal courts that have confronted the propriety of a shift from a forward to a reverse confusion theory have permitted plaintiffs to switch theories even after the close of discovery. *See, e.g.*, *Kinbook, LLC v. Microsoft Corp.*, 866 F. Supp. 2d 453, 462 (E.D. Pa. 2012), *aff'd*, 490 F. App'x 491 (3d Cir. 2013); *Birmingham v. Mizuno USA, Inc.,* No. 09–566, 2011 WL 1299356, at *17, n.20 (N.D.N.Y. Mar. 31, 2011); *Trouble v. Wet Seal, Inc.,* 179 F. Supp. 2d 291, 296 (S.D.N.Y. 2001). The Court, therefore, applies the seven factors in light of Plaintiff's new reverse confusion theory.


SIMILARITY BETWEEN THE MARKS

In determining whether two marks are similar, courts view the marks as a whole. *See AutoZone, Inc. v. Strick*, 543 F.3d 923, 929-30 (7th Cir. 2008) ("The commercial impression of a trade-mark is derived from it as a whole, not from its elements separated and considered in detail"). Therefore, "comparison of the labels rather than the trademarks is appropriate." *Henri's Food Prods. Co. v. Kraft, Inc.*, 717 F.2d 352, 355 (7th Cir. 1983). Moreover, the similarity

comparison should be "made in light of what happens in the marketplace, and not merely by looking at the two marks side-by-side." *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 898 (7th Cir. 2001) (quoting *James Burrough Ltd. v. Sign of Beefeater, Inc.*, 540 F.2d 266, 275 (7th Cir. 1976)). However, "if one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." *Henri's Food Prods.*, 717 F.2d at 356. The ultimate question a court must ask is not whether a consumer could confuse the two marks, but "whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." *AutoZone*, 543 F.3d at 930. Under Plaintiff's reverse confusion theory, the question is whether consumers would believe that Plaintiff is the source of the hydrogen peroxide in Hydrox GPC. Viewing the evidence in light of this precedent, the Court finds that this factor favors Plaintiff – though not strongly.

Below is an image of the most similar of Plaintiff's and Defendant's products:



(Pl.'s Stmt. Fact, Dkt. # 72, ¶ 1.)

As shown above, Plaintiff's and Defendant's products are distinguishable in many respects. Both parties' labels include the word "Hydrox," but this word appears in noticeably different fonts and is surrounded by different elements. Plaintiff's labels position the word "Hydrox" immediately beside Plaintiff's shield logo or within a blue oval, while Defendant's labels do not include any of these characteristic features. Instead, Defendant's label places the word "Hydrox" alone below – and in smaller lettering than – Defendant's own prominent "JohnsonDiversey" or "Diversey" logo with a water-droplet image. The clear and conspicuous inclusion of Defendant's own name and logo contributes to differentiating the labels. *See Ziebart Int'l Corp. v. After Market Assocs., Inc.*, 802 F.2d 220, 227 (7th Cir. 1986) ("Prominent display of different names on the marks ... reduce[s] the likelihood of confusion even where ... the marks are otherwise similar").

There are, however, features of the product lines that suggest the possibility for confusion. As Plaintiff points out, "Hydrox" is the "critical part" of the label and accordingly weighs more heavily in the analysis than other surrounding elements. *See Henri's Food Prods.*, 717 F.2d at 356. The word itself is identical on the two sets of labels, and neither combines it with other words or phrases; in both cases, the label presents "Hydrox" as a stand-alone identifier rather than a single word in a longer product name.[2] Moreover, the fact that Virox rather than Plaintiff is the source of the hydrogen peroxide in Defendant's product is relegated to the bottom of Defendant's labels, and in a smaller font size than the other elements. Plaintiff is also correct that some (though not all) of Plaintiff's products are packaged in tall, white plastic bottles similar to those used by Defendant's Hydrox GPC, and that some (though not all) of Defendant's labels use a blue-on-white color scheme similar to that on Plaintiff's labels. (Decl. David Merritt, Dkt.

_____

[2] While the name of Defendant's product is technically "Hydrox General Purpose Cleaner with Hydrogen Peroxide" the word Hydrox is positioned above and significantly larger than the other words and is printed in a different color.

# 63, Exs. 45, 46.) Finally, while Defendant's inclusion of its own corporate name and logo would render the marks more distinguishable in a forward confusion case, in a reverse confusion case "the linking of the plaintiff's mark with the defendant's brand name is an aggravation, not a justification." *Sands*, 978 F.2d at 960.

Accordingly, the similarity of the marks on the whole cuts in Plaintiff's favor. The visual distinctions in the fonts and logo designs of the word "Hydrox" as used in the labels are not trivial, but they are most notable when viewing the two bottles side-by-side – something consumers are unlikely to do, as discussed below. *See Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1362 (7th Cir. 1995) ("[W]here, as in this case, the public does not encounter the parties' trademarks together, the existence of minor differences that would clearly distinguish them in a side-by-side comparison does not refute an inference of likely confusion"). The word at issue itself is identical, and Defendant's placement of its own name and logo on the label cannot save it from liability where Plaintiff pursues a reverse-confusion theory. Accordingly, this factor slightly favors Plaintiff.

## SIMILARITY OF THE PRODUCTS

With respect to similarity of the products, courts ask not whether the products are interchangeable but rather whether the products are the kind the public is likely to attribute to a single source. *See Autozone, Inc.*, 543 F.3d at 931 ("The rights of an owner of a registered trademark extend to any goods or services that, in the minds of consumers, might be put out by a single producer"). Products are similar for trademark purposes where they "would reasonably be thought by the buying public to come from the same source, or thought to be affiliated with,

connected with, or sponsored by, the trademark owner." *CAE, Inc.*, 267 F.3d at 679 (quotation marks omitted).

The parties dispute how best to characterize Plaintiff's product line, but the Court finds that question largely irrelevant under Plaintiff's reverse confusion theory. Even if consumers would not expect Plaintiff's mostly health and beauty products to be produced by the same company that manufactures general purpose cleaners, Defendant's Hydrox GPC contains hydrogen peroxide. Hydrogen peroxide solution is the product for which Plaintiff is best known. (Pl.'s Stmt. Fact, Dkt. # 72, ¶ 6.) Under Plaintiff's reverse confusion theory, the danger of the alleged infringement is that consumers will assume Plaintiff has become affiliated with Defendant or that Plaintiff provides the hydrogen peroxide in Defendant's Hydrox GPC. While Defendants are certainly correct that hydrogen peroxide is an ingredient in many products and that not all hydrogen peroxide comes from the same source, this does not change the analysis. Plaintiff sells hydrogen peroxide to a number of other companies for use in their own branded products. (Pl.'s Ex. 1, Dkt. # 74 at ¶ 4). As such, consumers would hardly be unreasonable in believing that Plaintiff could have entered into just such a relationship with Defendant here. *See Wm. Wrigley Jr. Co. v. Swerve IP, LLC*, 900 F. Supp. 2d 794, 801 (N.D. Ill. 2012) (noting that where plaintiff made artificial sweetener and defendant made sugar-free gum, "the public may well believe that Swerve sweetener has somehow become affiliated with sugar-free Swerve gum").

While this cuts in Plaintiff's favor, however, the likelihood of confusion is sharply limited based on the fact that Defendant's label identifies Virox – not Plaintiff – as the source of the hydrogen peroxide in Hydrox GPC. As discussed above, the portion of Defendant's label identifying its hydrogen peroxide source is not so prominent as to render the parties' use of the

mark dissimilar. It is, however, sufficiently clear to put buyers on notice that Plaintiff is *not* Defendant's hydrogen peroxide supplier – particularly given the degree of consumers are likely to exercise, as discussed below. This disclosure on the Hydrox GPC label is important, as the impression of a false association between Plaintiff and Defendant is precisely the injury Plaintiff asserts in its new reverse confusion theory of the case. (Pl.'s Reply, Dkt. # 100, at 8) ("Hydrox is complaining that Diversey's use of the Hydrox mark… is likely to cause confusion as to whether Hydrox supplied the hydrogen peroxide for the product or was otherwise involved.") Accordingly, this factor does not weigh heavily in favor of either party. Consumers could certainly believe that Plaintiff, a hydrogen peroxide vendor, supplied the hydrogen peroxide in Hydrox GPC. However, because Defendant's label identifies its hydrogen peroxide source as a company other than Plaintiff, the likelihood of consumers actually misconstruing a relationship between Plaintiff and Defendant is low.


AREA AND MANNER OF CONCURRENT USE

When considering this factor, courts look at "whether there is a relationship in use, promotion, distribution or sales between the goods or services of the parties." *CAE, Inc*., 267 F.3d at 681. Relevant factors include the areas of geographical distribution, evidence of direct competition between the parties, whether the goods are sold to consumers in the same type of stores, and whether the goods are sold through the same marketing channels. *See Ty*, 237 F.3d at 900. "The parties need not be in direct competition and their goods and services need not be identical" for this factor to support a likelihood of confusion. *Forum Corp. of N. Am. v. Forum, Ltd*., 903 F.2d 434, 442 (7th Cir. 1990).

The Court finds little evidence that Plaintiff's Hydrox-branded products and Defendant's Hydrox GPC were used, marketed, or distributed through similar commercial channels. The record reflects that Plaintiff's products sold under the Hydrox mark are marketed and sold primarily to hospitals and health care providers for use in patient care. (Decl. David Merritt, Dkt. # 63, Ex. 3 at 40.) The only evidence of sales of Hydrox-branded products to any non-healthcare entity is the sale of some products for retail to Sally Beauty Supply. (*Id.* at 46.) Defendant's Hydrox GPC was, on the other hand, sold primarily to retail stores, hotels, and other such institutions for janitorial uses. (Decl. Peter Teska, Dkt. # 62, Ex. 1; Decl. David Merritt, Dkt. # 63, Ex. 70.) While Hydrox GPC is used exclusively for surface cleaning, the only evidence of Plaintiff's Hydrox-branded products being used for cleaning is the testimony of Baldocchi that hydrogen peroxide is the "duct tape of chemicals" and that in his experience both household consumers and hospitals may use Plaintiff's hydrogen peroxide for disinfecting surfaces. (Pl.'s Ex. 26, Dkt. # 79 at 39-40.) Baldocchi also testified, however, that he did not believe Plaintiff's hydrogen peroxide solution was labeled for anything other than first aid antiseptic use, and that that while hospitals "could" use hydrogen peroxide for "niche cleaning," he doesn't "get down to what the specifics are" of the intended use when selling Plaintiff's products to buyers. (*Id.* at 40.)

Plaintiff's claim that the parties were in "direct competition" is belied by the record; despite extensive discovery, the only evidence of verifiable customer overlap is three medical supply companies that distributed Plaintiff's products and also purchased Hydrox GPC for resale. However, these three distributors bought a combined total of 196 units of Hydrox GPC for under $10,000 – less than 1% of Defendant's total GPC sales. (Decl. Peter Teska, Dkt. # 62, Ex. 3; Decl. David Merritt, Dkt. # 63, Ex. 57.) Plaintiff's reverse confusion theory depends on Defendant – the larger, junior user – having exploited its size and ubiquity to flood the market

with advertisements or infringing goods such that consumers form an association between the mark at issue and Defendant. The *de minimis* evidence of actual overlap in customers or commercial channels severely undermines Plaintiff's theory. Moreover, the fact that the janitorial departments of some hospitals may use Hydrox GPC for cleaning while other departments of those hospitals use Plaintiff's products in patient care does not suggest likelihood of confusion given the sharp difference between those functions. *See Astra Pharm. Products, Inc. v. Beckman Instruments, Inc.*, 718 F.2d 1201, 1207 (1st Cir. 1983) ("The 'hospital community' is not a homogeneous whole, but is composed of separate departments with diverse purchasing requirements, which, in effect, constitute different markets for the parties' respective products").

Plaintiff confronts this deficiency by advancing four arguments that this factor should be resolved in its favor: (1) that the customer overlap noted above understates actual overlap because of sales to group purchasing organizations; (2) that the record reflects overlapping use of the two product lines for cleaning by Northwestern Memorial Hospital; (3) that both parties had business relationships with Target and Wal-Mart; and (4) that the products were sold via identical channels over the Internet. The Court examines each of these arguments in turn and finds none persuasive based on the evidence in the record.

Plaintiff's assertion of much greater customer overlap is extremely unclear. The citations to the record Plaintiff offers reflect only that Defendant sold Hydrox GPC to several companies called Hospital Housekeepers of America, Healthtrust Consorta, Med Assets, Novation, and Premier. (Pl.'s Stmt. Fact, Dkt. # 72, ¶ 94.) Plaintiff's Statement of Facts asserts that these companies are "group purchasing organizations" that negotiate with vendors on behalf of hospitals, and claims that Plaintiff's Hydrox-branded goods are sold through these group

purchasing organizations because Plaintiff's direct customers (specifically, medical suppliers) resell Plaintiff's goods to these organizations. (*Id.* at ¶ 93.) The Statement of Facts, however, fails to cite to any record evidence corroborating what these organizations do or whether they have ever dealt in any of Plaintiff's products. To the extent that Plaintiff is arguing that because Plaintiff sells goods to medical suppliers, some of these suppliers *probably* resold some of those goods to group purchasing organizations that deal in Defendant's products, this assertion is wholly speculative. Such speculation is of no weight at this stage of the litigation; Plaintiff had ample time during discovery to provide proof of this theory and wholly failed to do so, as there is no record evidence of any of these group purchasing organizations ever dealing in Plaintiff's products.

Northwestern Memorial Hospital is of even less use to Plaintiff than the group purchasing organizations. The only proof Plaintiff offers of overlapping use for cleaning in this hospital is a photograph of what appears to be a handcart filled with bottles, some of which are Plaintiff's products and others of which appear to bear the Diversey logo. (Pl.'s Ex. 35, Dkt. # 81.) Ramanandan testified that he personally took this picture of a cart in a hallway at Northwestern Memorial. (Pl.'s Ex. 29, Dkt. # 80 at 212.) However, the only Diversey product visible on this cart is clearly *not* Hydrox GPC but rather some other Diversey product. The fact that one of Defendant's many non-Hydrox products wound up in a hospital that uses Plaintiff's products is not probative of the likelihood of confusion regarding Hydrox GPC specifically. Nothing in the record establishes that this is – as Plaintiff now purports it to be – a janitorial cart, and thus nothing about this photograph suggests Northwestern Memorial used Plaintiff's products for cleaning. In fact, Northwestern Memorial's inventory records reflect that various Diversey products (though *not* Hydrox GPC) were purchased for "housekeeping/cleaning," while

all purchases of Plaintiff's goods were listed as directed to specific patient care sections such as "cardiology" and "gynecology." (Pl.'s Ex. 30, Dkt. # 81 at A-C.)

Plaintiff's assertions regarding Target and Wal-Mart are more relevant, but are also ultimately of little weight. The record reflects that these two retail store chains were Defendant's biggest customers for Hydrox GPC. (Decl. Peter Teska, Dkt. # 62, Exs. 1, 3.) While Plaintiff never sold any Hydrox products to them, it repeatedly discussed the possibility of supplying health and beauty products to the stores for resale to their customers. (Pl.'s Ex. 1, Dkt. # 74 at ¶ 18.) Although the fact that sales of Hydrox-branded goods to Target and Wal-Mart were never consummated does not necessarily foreclose a possibility of confusion, the record reflects that these stores would have used the products at issue in very different ways. Had Target or Wal-Mart purchased goods from Plaintiff, it would have been with the purpose of reselling those goods to retail customers. The stores purchased Hydrox GPC, by contrast, for cleaning their own buildings; there is no indication in the record that these stores ever stocked Hydrox GPC for resale to customers.

Finally, Plaintiff insists that its goods and Hydrox GPC were distributed through at least one shared channel: Internet sales. While there is no evidence that either party ever sold its products directly over the Internet, both parties' goods came to be listed for sale online via downstream customers offering the products for resale. (Pl.'s Ex. 19, Dkt. # 77 at 38-39; Pl.'s Ex. 25, Dkt. # 79.) However, the resale of products on the Internet alone is not sufficient to constitute a shared channel of distribution for purposes of the likelihood of confusion analysis. *See Flagstar Bank, FSB v. Freestar Bank, N.A.*, 687 F. Supp. 2d 811, 830-31 (C.D. Ill. 2009) (finding unpersuasive the argument that "the maintenance of two independent websites, which are not linked in any way, constitutes an overlapping marketing channel for purposes of this

discussion"). In this day and age, virtually any product can be purchased somewhere online – were courts to take seriously the assertion that availability of a product on the Internet constitutes a common channel of distribution, the area and manner of concurrent use factor would weigh in favor of nearly *every* trademark plaintiff. In this case, Plaintiff appears to have identified only one website that offered both parties' products for sale: the website for the medical supply company Medline.[3] (Pl.'s Ex. 25, Dkt. # 79.) Medline, however, was one of the three overlapping customers noted above, and the volume of Defendant's sales to these three customers was so small as to be *de minimis*.

Accordingly, the Court finds that the area and manner of concurrent use factor favors Defendant. The record reflects that the parties' products were overwhelmingly sold through different channels to different customers and for different uses, suggesting that confusion is unlikely.

DEGREE OF CARE LIKELY TO BE EXERCISED BY CONSUMERS

Generally, the cheaper and more commonly used an item is "the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases." *CAE, Inc.*, 267 F.3d at 683. Where consumers are more sophisticated the likelihood of confusion is lower, while less sophisticated consumers are more likely to be confused as to the source of a product. *See Rust Env't & Infrastructure, Inc. v. Teunissen*, 131 F.3d 1210, 1217 (7th Cir. 1997). Although in a forward confusion case the sophistication of both parties' customers is relevant, in a reverse confusion case the senior user's customers are more important. *See Wm. Wrigley,* 900 F. Supp. 2d at 802.

---

[3] Plaintiff directs the Court to a host of cleaning supply sites that offered Hydrox GPC for sale. (Pl.'s Ex. 25, Dkt. # 79.) Plaintiff, however, nowhere alleges that these sites also sold any of Plaintiff's Hydrox-branded products.

Neither party sells directly to retail consumers, and the relevant consumers for both parties are large commercial buyers.[4] While Plaintiff's products are relatively inexpensive, Plaintiff's customers are overwhelmingly hospitals and medical supply companies who buy in bulk and who Plaintiff concedes "will exercise some degree of care." (Pl.'s Mot. Summ. J., Dkt. # 68 at 14.) Plaintiff offers no evidence to show that its customers are in any sense unlikely to exercise care in making purchasing decisions. Instead, Plaintiff raises a theory of "initial interest confusion" by buyers. While Plaintiff fails to fully articulate how this theory applies, it seems to suggest that buyers familiar with Plaintiff's mark will be attracted to Defendant's Hydrox GPC in the mistaken belief that Plaintiff supplied the hydrogen peroxide in the product – and that even if it later becomes clear to the buyer that Plaintiff was not in fact involved, Defendant will have benefited by using Plaintiff's mark to attract attention to its product in the first place. To the extent that Plaintiff believes this new theory renders the sophistication of its customers irrelevant, such belief is mistaken. The Seventh Circuit has made clear that customer sophistication reduces the likelihood of confusion even in an initial interest case. *See, e.g.*, *Syndicate Sales, Inc. v. Hampshire Paper Corp.*, 192 F.3d 633, 638 (7th Cir. 1999) (rejecting initial interest confusion claim because sophisticated retailers "are in a better position than the typical consumer either to order the correct goods, or to return the incorrect goods and receive the intended goods"); *Rust*, 131 F.3d at 1217 (affirming district court's denial of a preliminary injunction premised on initial interest confusion, because "consumers' sophistication given the

---

[4] Plaintiff disputes this characterization by offering several email exchanges in which consumers contacted Plaintiff to inquire about products. (Pl.'s Ex. 1-A, Dkt. # 82.) Far from undercutting the fact that Plaintiff's customers were institutions, however, the emails support this inference. Virtually all of the emails come from a consumer who used one of Plaintiff's products in a hospital setting and subsequently contacted Plaintiff precisely because he or she *could not* find the product offered for sale directly to consumers. Plaintiff responded to at least some of these consumer inquiries by noting that Plaintiff's products "are not currently available through any retail store" and that Plaintiff would be willing to sell directly to consumers "in case quantities only." (Def.'s Ex. 20, Dkt. # 64.)

small market of wastewater engineers and high cost of wastewater projects indicate that such confusion is unlikely").

Accordingly, the Court finds that this factor weighs strongly in favor of Defendant. Hospitals and other health care institutions are sophisticated, professional buyers likely to exercise great care regarding the source of the goods they purchase for patient care. Such care is particularly likely with regard to purchasing antiseptics used in patient care such as Plaintiff's Hydrox-branded products. Accordingly, this factor weighs strongly in favor of Defendant.


STRENGTH OF PLAINTIFF'S MARK

Consumer confusion is generally more likely when the mark at issue is stronger. *See Autozone*, 543 F.3d at 933. The "strength" of a trademark for purposes of the likelihood of confusion analysis refers to the mark's distinctiveness and tendency to identify goods as originating from a particular source. *See Sands*, 978 F.2d at 959. In reverse confusion cases, the focus is on "the strength of the mark in terms of its association with the junior user's goods." *Id*.

This focus on the mark of a defendant, however, can lead to the anomalous result that a plaintiff may be *more* likely to win a reverse confusion claim when its own mark is weak and generic than when it is arbitrary or fanciful. The Third Circuit recognized this problem and adopted a two-pronged test, in which *commercial* strength of the junior user's use of the mark is weighed alongside *conceptual* strength of the mark. *See A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 231 (3d Cir. 2000). While the Seventh Circuit has not explicitly adopted this approach to reverse confusion cases, district courts in the circuit have applied the two-pronged framework in assessing likelihood of confusion. *See, e.g.*, *Chattanoga Mfg., Inc. v. Nike, Inc.*, 140 F. Supp. 2d 917, 927 n.10 (N.D. Ill. 2001), *aff'd as modified*, 301

F.3d 789 (7th Cir. 2002) ("We believe that this two-prong approach to the strength of mark determination would adequately address [defendant's] concern of 'perverse results'"); *Humanly Possible, Inc. v. Manpower, Inc.*, No. 11 C 4977, 2013 WL 633332, at *6-7 (N.D. Ill. Feb. 19, 2013) (applying Third Circuit test and granting summary judgment for defendant where mark was conceptually weak and there was little evidence of commercial strength). Accordingly, the Court examines (1) whether the evidence shows Defendant's sale of Hydrox GPC caused a strong marketplace association between Defendant and the term "Hydrox"; and (2) whether "Hydrox" as applied to the goods at issue is conceptually strong.

With regard to commercial strength, there is no evidence in the record that Defendant's marketing and sale of Hydrox GPC caused consumers to associate "Hydrox" with Defendant. Hydrox GPC was produced for two years and sold for a total of just under $6 million. (Decl. Peter Teska, Dkt. # 62, Ex. 1.) The fact that Defendant successfully sold Hydrox GPC is, however, not enough to support a finding that confusion is likely. Reverse confusion arises when the junior user exploits its superior size to flood the market with goods and advertising and thereby induces consumers to associate the mark with the junior user. *See Sands*, 978 F.2d at 957 (explaining that reverse confusion arises when a "large junior user saturates the market" with infringing goods); *Wm. Wrigley*, 900 F. Supp. 2d at 798 (defining a reverse confusion case as one in which the junior user "uses its size and market power to overwhelm a senior, but smaller, mark user"). There is simply no evidence in the record of large-scale marketing or promotion sufficient to firmly link the term "Hydrox" with Defendant in the minds of consumers.[5] Plaintiff

---

[5] The situation in this case is readily distinguishable from *Wm. Wrigley*, the case Plaintiff cites as analogous. In *Wm. Wrigley*, the record reflected that defendant's chewing gum was the third most popular gum in the nation and that the defendant had promoted it nationwide – including advertisements in *Rolling Stone*. *See Wm. Wrigley*, 900 F. Supp. 2d at 802-03. There is no evidence Hydrox GPC was ever promoted so vigorously or achieved such market success. Moreover, despite the extensive evidence of market saturation, the court in *Wm. Wrigley* concluded only that the strength of the mark factor "weighs marginally in favor" of the plaintiff. *Id*. at 803.

has conducted no consumer surveys or pointed to any advertising or marketing materials from which the court could conclude that Defendant's use of the mark was commercially strong.

Plaintiff argues that commercial strength is demonstrated by the fact that Defendant chose the name Hydrox intentionally from among all other options, as well as by evidence of an unrelated trademark dispute between Defendant and the producer of a product called "Hydrax." (Pl.'s Reply, Dkt. # 100, at 9-10.) Neither of these facts establishes commercial strength. The record reflects only that Defendant's marketing department preferred the name Hydrox because of its "brand equity." (Pl.'s Ex. 19, Dkt. # 77 at 57.) This shows at best only that Defendant *hoped* the name would resonate with consumers, not that this effort succeeded or was likely to. The fact that a third party demanded Defendant cease and desist using the "Hydrox" name because it was too similar to "Hydrax" says nothing about the commercial strength of Hydrox GPC. Such evidence, again, suggests only that some unrelated third party feared Defendant's use of the mark had the possibility of gaining commercial traction.

In terms of conceptual strength, the Court finds that "Hydrox" is not conceptually strong for use with hydrogen peroxide and products containing it. The term Hydrox is clearly a contraction of "hydrogen peroxide," and is thus merely descriptive – or at best, suggestive – of the goods at issue.[6] Plaintiff also manufactures products that have nothing to do with hydrogen peroxide, such as isopropyl rubbing alcohol. (Decl. David Merritt, Dkt. # 63, Ex. 2.) However, Plaintiff's reverse confusion theory alleges that consumers will be confused as to whether or not the hydrogen peroxide in Hydrox GPC was supplied by Plaintiff; the other goods Plaintiff

---

[6] Plaintiff's argues that Hydrox is conceptually strong because it is a wholly fanciful or arbitrary mark, and disputes that "the HYDROX mark is merely a shortened form of HYDrogen PerOXide." (Pl.'s Reply, Dkt. # 100, at 16.) The Court finds unpersuasive Plaintiff's arguments that the mark "fails to actually suggest hydrogen peroxide because it is missing the 'PER'" and that "'Hydr' might just as easily be construed as referring to water (as in 'hydro') and 'ox' to the animal. That would be descriptive of a 'water ox.'" (Pl.'s Mot. Summ. J., Dkt. # 68 at 16-17.) Plaintiff does not sell aquatic beasts of burden. Plaintiff sells hydrogen peroxide. Consumers confronted with Plaintiff's mark in a marketplace context can hardly fail to realize from whence the term "Hydrox" was derived.

manufacturers are irrelevant to this theory, as it alleges confusion with regard to Plaintiff's hydrogen peroxide business specifically. Moreover, Plaintiff admitted to the mark's conceptual weakness in its October 2012 submissions to the USPTO. In that proceeding, Plaintiff argued that it should be permitted to register the Hydrox mark for disinfecting products because "HYDROX and its phonetic equivalents are weak due to their common use by multiple actors," and therefore consumer confusion between Plaintiff's products and "Alpha Hydrox" brand skin lotions was unlikely. (Decl. David Merritt, Dkt. # 63, Ex. 13 at 5-7.) Plaintiff now asserts that these submissions to a federal agency are irrelevant, but the Court disagrees. The widespread use of the term Hydrox for a variety of products by a variety of entities renders confusion less likely, because the term is unlikely to be strongly associated with any one party in the minds of consumers.[7] Plaintiff cannot escape having relied on precisely such an argument in the USPTO proceedings. *See Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 476 (3d Cir. 2005) (finding relevant trademark plaintiff's prior USPTO submissions, whether characterized as "judicial estoppel, an admission, waiver, or simply hoisting [the plaintiff] by its own petard"); *Petro Stopping Centers, L.P. v. James River Petroleum, Inc.*, 130 F.3d 88, 94 (4th Cir. 1997) (finding confusion unlikely based partly on plaintiff's own representations to the USPTO arguing that the mark was widely used).

Accordingly, because there is no evidence that Defendant's use of the Hydrox mark can be considered commercially strong and because the mark is conceptually weak, this factor favors Defendant.

---

[7] It is telling that Baldocchi, a longtime veteran of the chemical industry himself, testified in his deposition that when he met Ramanandan his first thoughts were of the famous cookies that share Plaintiff's name. (Decl. David Merritt, Dkt. # 63, Ex. 16 at 59, lns. 3-5) ("First thing that came to my mind when I met Ram was Hydrox Cookies.")

ACTUAL CONFUSION

Although the likelihood of confusion factors are an equitable balancing test and no one factor is dispositive, evidence of actual consumer confusion is universally acknowledged to be a of special significance. *See Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1044 (7th Cir. 2000) (actual confusion is "particularly important"); *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 462 (7th Cir. 2000) (actual confusion among the three "most important considerations").

Plaintiff is correct that absence of actual consumer confusion is not fatal to a plaintiff's claim – a court may still find confusion *likely* even where none has in fact occurred. *See Sands,* 978 F.2d at 960 ("As we have stated many times, however, the plaintiff need not show actual confusion in order to establish *likelihood* of confusion") (emphasis in original). Nonetheless, in light of the unique probative value of actual confusion on the question of whether future confusion is likely, courts regard infringement cases with suspicion where a plaintiff fails to offer any evidence at all on actual confusion – particularly where the plaintiff has not even attempted to conduct surveys, gather customer testimonials, or seek out any of the other usual methods of proving confusion in a trademark suit. *See, e.g.*, *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1046 (7th Cir. 2000) (reversing grant of preliminary injunction in favor of plaintiff where plaintiff "could have conducted a survey using a hypothetical question asking would-be consumers to compare the two restaurants. It could have solicited testimony from an expert in marketing or psychology."); *Libman*, 69 F.3d at 1361 (noting that evidence of confusion was "vanishingly thin" and that plaintiff failed to conduct any surveys to seek evidence of confusion); *Sorensen v. WD-40 Co*., No. 12 C 50417, 2014 WL 4437527, at *1 (N.D. Ill. Sept. 9, 2014) (granting summary judgment for defendant where there was "no

evidence that any consumer has ever inquired, orally or in writing, whether [defendant's] products are in any way connected to plaintiff's products. Nor did plaintiff conduct any survey in an effort to determine the likelihood of confusion").

In arguing that this factor supports a finding of likelihood of confusion, Plaintiff offers the testimony of Baldocchi that he was initially confused upon seeing Defendant's product on the desk of a sales contact. (Pl.'s Ex. 26, Dkt. # 79 at 44, 57-58.) This testimony is insufficient to create a triable issue of fact as to actual confusion for several reasons. Baldocchi is not a consumer within the meaning of the Lanham Act, as he was not a purchaser of either party's products. *See Packman*, 267 F.3d at 645 (holding that the individuals plaintiff advanced as actually confused were not relevant "consumers" under the Lanham Act because plaintiff did not show that they purchased or attempted to purchase the goods in question). In fact, Baldocchi is a personal friend of Plaintiff's owner and a paid sales consultant for Plaintiff's products. (Pl.'s Ex. 26, Dkt. # 79 at 25-27.) Moreover, even if Baldocchi qualified as a consumer, a single anecdote of confusion would be *de minimis* evidence at best in light of the number of customers that purchased Hydrox GPC. *See Packman*, 267 F.3d at 645 (affirming district court's holding that confusion on the part of four consumers was *de minimis* evidence of actual confusion); *Door Sys., Inc. v. Pro–Line Door Sys., Inc*., 83 F.3d 169, 173 (7th Cir. 1996) ("[W]e think it wholly unlikely that any significant number of consumers would be misled. And that is the test, so that the plaintiff's evidence that two consumers (out of how many thousands?) may have been misled cannot by itself be thought to create a contestable issue of likelihood of confusion.") (internal citation omitted); *Sunmark, Inc. v. Ocean Spray Cranberries, Inc*., 64 F.3d 1055, 1060 (7th Cir. 1995) (holding evidence that three consumers were confused insufficient to demonstrate likelihood of confusion).

Other than Baldocchi's testimony, Plaintiff offers no evidence of consumer confusion.[8] The record reflects that no surveys were conducted and no customer testimonials were gathered. Given the fact that Defendant's Hydrox GPC was sold for nearly three years, the failure of Plaintiff to produce any evidence on this issue is telling. *See Libman*, 69 F.3d at 1361 (noting that where defendant had sold thousands of allegedly infringing brooms, "if confusion were likely, one would expect at least one person out of this vast multitude to be confused, or more precisely one would expect [plaintiff] to have been able to find one such confused person").

For these reasons, this factor weighs heavily in favor of Defendant.

INTENT OF DEFENDANT

While evidence of a defendant's intent to "palm off" its products as plaintiff's goods is among the most important factors under a forward confusion theory, it is irrelevant in a reverse confusion case. *See Sands*, 978 F.2d at 961 (holding district court erred in considering defendant's intent, because this factor "is essentially irrelevant in a reverse confusion case"). Whether Defendant knew of Plaintiff's mark prior to using the "Hydrox GPC" and thus acted in bad faith is only relevant in assessing damages, an issue not before the Court on these cross motions for summary judgment. *See Wm. Wrigley*, 900 F. Supp. 2d at 803 ("Whether Wrigley knowingly ignored Swerve IP's trademark is relevant—just in balancing the harms"). Because intent is not relevant at the liability stage of a reverse confusion case, this factor cuts in favor of neither party.

---

[8] Plaintiff also insists that John Rau, a former Diversey executive, conceded in his deposition that confusion was likely if the two parties' products were sold to the same hospital. The Court disagrees with this interpretation of Rau's testimony, as he made very clear that he thought confusion *unlikely* due to the very different uses of the products. (Pl.'s Ex. 23, Dkt. # 78 at pg. 99 ll. 8-10) ("So I wouldn't think it would be too confusing because they would be used very differently in the hospital.") Even if this testimony could be read as an opinion that confusion was likely, unsupported speculation by a former employee of Defendant in response to a hypothetical question hardly constitutes evidence of *actual* confusion.

BALANCING THE FACTORS

The existence of a genuine issue of material fact as to one or more likelihood of confusion factors does not preclude summary judgment where the totality of the evidence does not suggest likelihood of confusion. *See AHP Subsidiary Holding*, 1 F.3d at 616. The weight of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether a majority of the factors tilt the scale in favor of one side or the other. *See Schwinn*, 870 F.2d at 1187; *see also Ty*, 237 F.3d at 901-02 (affirming a ruling in favor of the plaintiff, despite the fact that only one of the most important factors was in plaintiff's favor).

In light of Plaintiff's reverse confusion theory, the Court believes that Plaintiff has failed to show a triable issue of fact as to the likelihood of confusion. Of the seven factors, the only one weighing in Plaintiff's favor was the similarity of the marks – and as the foregoing made clear, this similarity alone is not enough that a reasonable jury could conclude consumer confusion was likely. Plaintiff has failed to offer any evidence of actual confusion, a failure which seriously undermines Plaintiff's contention that consumers will be confused. *See Nike, Inc. v. Just Did It Enters*., 6 F.3d 1225, 1231 (7th Cir. 1993) (noting that in resolving a summary judgment motion "it is certainly proper for the trial judge to infer from the absence of actual confusion that there was also no likelihood of confusion"). Plaintiff also failed to offer evidence upon which a jury could conclude that its trademark is conceptually strong, or that Defendant's use of the mark was commercially significant. The similarity of the products is undercut by Defendant's clear identification of Hydrox GPC's hydrogen peroxide source on the label, and Plaintiff has failed to demonstrate significant overlap in the area and manner of use. Finally, Plaintiff's customers are sophisticated institutional buyers likely to exercise care in purchasing products. Based on the evidence before the Court, no reasonable trier of fact could conclude that there is a likelihood of

confusion. Because likelihood of consumer confusion is a necessary element of all of Plaintiff's claims, Defendant is entitled to summary judgment.

**Conclusion**

For the reasons set forth above, the Court grants Defendant's Motion for Summary Judgment [59] and denies Plaintiff's Motion for Summary Judgment [68]. Defendant's motion to exclude the expert testimony of Rick Baldocchi [56] is deemed as moot.

**Date**: March 23, 2015

_____
          **Ronald A. Guzmán**
          **United States District Judge**